IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2017


**DANNY O. OWENS v. STATE OF TENNESSEE**


**Appeal from the Circuit Court for Lawrence County**
**No. 32740      Stella L. Hargrove, Judge**

---

**No. M2016-02068-CCA-R3-PC**

---


The Petitioner, Danny O. Owens, appeals the denial of his petition for post-conviction relief from his second degree murder conviction, alleging he received ineffective assistance of trial counsel.  After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

John S. Colley, III, Columbia, Tennessee, for the appellant, Danny O. Owens

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Brent A. Cooper, District Attorney General; and Christi L. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Petitioner was indicted for the first degree premeditated murder of his wife and, following a jury trial, convicted of the lesser offense of second degree murder.  The trial court sentenced the Petitioner to twenty years at 100%.  This court affirmed the trial court's judgment on direct appeal, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal.  State v. Danny Owens, No. M2012-02717-CCA-R3-CD, 2014 WL 1173371, at *1 (Tenn. Crim. App. Mar. 24, 2014), perm. app. denied (Tenn. Sept. 25, 2014).

This court's opinion on direct appeal reveals that law enforcement officers responded to a deceased-person call at the Petitioner's residence on February 8, 2009, where they discovered the victim's body sitting in a rocking chair in the living room. Id. A revolver was found near the victim's body, and a single bullet had entered the victim's right cheek, causing multiple wounds to her face, shoulder, and arm. The Petitioner told the officers that the victim had committed suicide, explaining that the victim suffered with painful medical conditions and had confronted him about having an affair. Id. at *2-3. The victim suffered from diabetes, arthritis, knee problems, and stress fractures in her feet, for which she was undergoing treatment and taking medications, but her health had never kept her from working. Id. at *4-5. A few days before her death, the victim told her adult daughter that she believed the Petitioner was having an affair. The victim had complained about the Petitioner's infidelity on other occasions but had never appeared suicidal. Id. at *5.

Two days before the victim's death, while the victim's mother and the victim were talking on the telephone, the victim's mother overheard the Petitioner tell the victim, "I bought myself a [.]357. . . . I'm going to kill your God d*** ass." Id. at *6. The day before her death, the victim was in a "very good" mood and was buying Valentine's gifts. Also, the victim was "really looking forward" to her son's wedding in May and had requested vacation time from her employer to attend the wedding in Florida. Id. at *5.

The Friday before her death, the victim told one of her co-workers, Melba McKey, that she was going to confront the Petitioner about his affair. Id. at *9. Ms. McKey had known the victim for twelve years and had seen physical signs of her turbulent marriage, including bruises on her neck and arm. When she asked the victim about the bruises that resembled fingerprints on her neck, the victim said that the Petitioner had choked her. Id. The victim's supervisor also had worked with the victim for twelve years and had observed bruises on the victim's wrists and arms on several occasions. Id. at *8.

Deputy Donald Ward with the Giles County Sheriff's Department was dispatched to the Petitioner's residence on June 22, 2003, after a neighbor reported a domestic disturbance between the victim and the Petitioner. Id. He observed that the victim had an injury inside her mouth on her lower lip, a scratch under her left jaw, and a swollen right wrist. Deputy Ward read a victim's rights form to the victim and left a copy with her. Id.

A Smith & Wesson .357 magnum revolver containing four unspent rounds and one spent round was found near the victim's body. Id. at *1. The investigating detective, who photographed the gun as he opened the cylinder, noticed that the top chamber, located underneath the hammer, had an unfired round and that a spent round was in the chamber to the left of the unfired bullet. He explained that in order for a live round to be

underneath the hammer of the gun, the trigger would have to be pulled again, which would cause a second spent cartridge to be in the gun; or the hammer would have to be manually pulled again; or the cylinder would have to be taken out, rotated, and put back into the gun. Id. A Tennessee Bureau of Investigation (TBI) agent, an expert in firearms examination and identification, examined the revolver and noted that it had a large frame, making it heavy, and that the spent cartridge would have ended up underneath the hammer unless the gun was manipulated. According to the agent, it would take human manipulation for the spent cartridge to end up one cylinder to the left of the hammer. Id. at *10.

During an interview with another TBI agent, the Petitioner admitted that he had had several affairs and that, after the victim's death, he "might have" left a message on the answering machine of a woman he had previously dated, asking if she would go out with him now that the victim was dead.[1] Id. at *7. According to the Petitioner, the victim had extensive pain in her arms and legs and had been prescribed several medications. However, he never told the TBI agent that the victim was suffering from depression or any mental illness. Id.

Although the medical examiner was unable to determine if the victim's manner of death was homicide or suicide, he noted that the gunshot wound was a close range wound that was angled, rather than perpendicular to the surface, and opined that the wound was unusual because of its location and the direction of the bullet path. He said that the gun found at the scene was heavy and would have been difficult for the victim to hold to produce the type of injury she suffered. Id. at *25.

At the conclusion of the trial, the jury convicted the Petitioner of the lesser-included offense of second degree murder, and the trial court sentenced him to twenty years at 100%.

On November 5, 2014, the Petitioner filed a pro se petition for post-conviction relief, alleging numerous claims, including that he was denied the effective assistance of trial counsel. After the appointment of post-conviction counsel, a "Pre-Hearing Memorandum" was filed on August 12, 2016, narrowing the Petitioner's issues for hearing to trial counsel's failure to object to testimony "as to prior allegations of domestic assault between the Petitioner and his wife, even though the trial court had previously ruled that such statements were inadmissible."

---

[1] The woman testified that two weeks after the victim's death, the Petitioner left a message on her answering machine, stating: "Now that she's dead, will you talk to me?" She immediately reported the message to the sheriff's department. Id. at *6.

At the beginning of the August 18, 2016 post-conviction hearing, two of the trial court's orders regarding pretrial motions, as well as a portion of the trial transcript containing certain testimony from Deputy Donald Ward and Melba McKey, were admitted as exhibits by the Petitioner. Trial counsel then testified that he had been practicing law since 1983, had served as a district public defender for six years before entering private practice, and had been certified in the area of criminal defense. He said that he was retained to represent the Petitioner in September 2010, after which he filed twenty-one pretrial motions and eight motions in limine in the case. The trial took place in April 2012 and lasted approximately four and one-half days.

Trial counsel said that the State's position was that the Defendant was "a womanizing wife beater" and that the State's witness list included several of the victim's co-workers, some of whom had had conversations with the victim about the way the Petitioner treated her. In an effort to block this evidence, trial counsel filed several pretrial motions regarding what the witnesses could say. Counsel said that "there were multiple issues that [they] continually dealt with up until the trial date."

Trial counsel said that he tried to limit Deputy Ward's testimony and acknowledged that he should have objected to Deputy Ward's testifying about leaving a victim's rights form with the victim. However, regarding objections, counsel noted: "You get into the issue of the witness starts that flow and you cut them off and object, and when you do that, does that really cause the jury to pay more attention to what's being done . . . or do you just let it on in and try to move on and maybe it doesn't attract a lot of attention[.]"

Trial counsel said that he did not object to Ms. McKey's statement because he did not "want to draw any attention to it and was hoping that the jury might not be paying that much of attention to her." Counsel again explained the numerous pretrial motions he filed in an effort to keep out any evidence of abuse. In trial counsel's opinion, Ms. McKey's testimony did not warrant a mistrial, and a sidebar conference could have resulted in the trial court's issuance of a cautionary instruction to the jury, which could have caught the jury's attention.

Following the hearing, the post-conviction court entered an order denying the petition. The Petitioner appealed.

## ANALYSIS

The Petitioner argues that he received ineffective assistance of counsel because trial counsel did not object to Deputy Donald Ward's testimony regarding his responding to a 2003 domestic violence call at the Petitioner's residence or to Melba McKey's

testimony regarding bruises on the victim's neck. The State responds that the Petitioner failed to establish that trial counsel's representation fell below the range of competence demanded by law or that any deficiencies adversely affected the verdict.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a

"probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In its order denying the petition, the post-conviction court stated:

[Trial counsel] has great knowledge, experience and skill in criminal defense. [Trial counsel] is a premier criminal defense attorney in the 22nd Judicial District. The record reflects his efforts of attempting to limit allegations of inappropriate conduct of Petitioner, and to limit the victim's many statements to others of domestic abuse during their marriage.

The Court will not question [trial counsel's] trial strategy in dealing with the allegations and statements that inappropriately came into the record. Clearly, [trial counsel] understands the impact of failure to object at trial. [Trial counsel] understands the right to request limiting instructions to the jury. He understands the right to move for a mistrial. Petitioner was not in custody during the trial; however, [trial counsel] stated he did not feel any of the issues warranted a mistrial. [Trial counsel] testified that, based on his experience and training, it was best to leave the issues alone and not attract further attention to them to the jury. The Court does not question this decision as sound trial strategy.

The record fully supports the findings and conclusions of the post-conviction court. Trial counsel testified that because he knew the State's position would be to portray the Petitioner as a "womanizing wife beater," he filed numerous pretrial motions in an effort to keep out such testimony. Counsel relied upon his experience in determining whether to object to witnesses' testimony, explaining that sometimes it was better to remain silent than to draw the jury's attention to it. In sum, the Petitioner has failed to meet his burden of demonstrating that he was denied the effective assistance of trial counsel.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the post-conviction petition.

_____
ALAN E. GLENN, JUDGE